808 S.E.2d 521

KIAWAH RESORT ASSOCIATES, L.P., a Delaware Limited Partnership, and Kiawah Development Partners II, Inc., Appellants/Respondents,

v.

KIAWAH ISLAND COMMUNITY ASSOCIATION, INC., a South Carolina Not-for-Profit Corporation, Respondent,

and

Kiawah Property Owners Group, Inc. and Inlet Cove Club Homeowners Association, Inc., Respondents/Appellants.

Appellate Case No. 2015-001146
Opinion No. 5517

Court of Appeals of South Carolina.

Heard March 8, 2017
Filed September 27, 2017
Rehearing Denied January 4, 2018

540

Ellis R. Lesemann and Michelle A. Matthews, both of Lesemann & Associates, of Charleston, for Appellants/Respondents.

Allison Carter Jett, of Weissman, P.C., of Atlanta, GA, for Respondent.

Amy E. Armstrong and Jessie A. White, both of the South Carolina Environmental Law Project, of Pawleys Island, for Respondents/Appellants.

LOCKEMY, C.J.:

In these cross-appeals Kiawah Resort Associates, L.P. (KRA) and Kiawah Development Partners II LLC (KDP II) (collectively Appellants) appeal from the Master-in-Equity's order declining to reform a deed given to Kiawah Island Community Association (KICA). Appellants assert the master erred by refusing to consider KICA's subsequent conduct as evidence of mutual mistake and finding there was no evidence KICA did not intend to accept 4.62 acres of oceanfront property as common area. Kiawah Property Owners Group, Inc. (KPOG) and Inlet Cove Club Homeowners Association (ICCHA) assert the master properly declined to reform the deed, but appeal the master's order finding KPOG and ICCHA did not have standing to participate in the action between Appellants and KICA. We affirm.

## FACTS

KRA is the developer of a substantial area on Kiawah Island. On September 26, 1994, KRA entered into a Development Agreement with the Town of Kiawah Island. As part of that agreement, KRA agreed to convey certain property to KICA as common property. Those lands included "a strip of scenic dunes and high land owned primarily by the Property Owner ... which extends along the Kiawah Island beachfront for approximately 10 miles as generally depicted on Exhibit 16.2." KRA agreed to convey by quit claim deed that property to KICA on or before January 1, 1996. KRA also agreed to convey property known as "Captain Sam's Spit" to KICA by January 1, 2008, "provided, however, that [KRA] may convey the eastern half of the spit to Charleston County Park & Recreation Commission prior to January 1, 2008."

On that same day, KRA entered into an Agreement for Conveyance with KICA. The stated purpose of the agreement was "to evidence its agreement to the conveyance of such properties in accordance with the terms and provisions of the Development Agreement." In consideration of the sum of $5.00, KRA agreed to convey, and KICA agreed to accept several tracts of land. Specifically, parcel 8, entitled "Approximately 10 Miles of Beachfront Property pursuant to Paragraph 16(b) of the Development Agreement" included a full legal description with specific metes and bounds. On December 29, 1995, KRA issued KICA a quit claim deed using the same legal description found in the Agreement for Conveyance.

Subsequently, KRA determined the property it conveyed in the 1995 deed included a 4.62-acre tract not contemplated in the Development Agreement. On March 1, 2013, KRA filed its complaint requesting the court reform the deed based on a mutual mistake and issue a declaratory judgment that the inclusion of this additional tract was "unintentional, in error, and a mistake, and contrary to the intent of the parties to the two Development Agreements of which KICA was a named third party beneficiary." After a trial, the master found KRA failed to present clear and convincing evidence of a mutual mistake and denied KRA's requests for a declaratory judgment and reformation of the deed. This appeal followed.

**KRA's APPEAL**

KRA asserts the master erred by denying its request for reformation of the 1995 deed based upon the intent expressed in the 1994 Development Agreement and KICA's subsequent conduct. KRA alleges all of the evidence presented during trial evidences a mutual mistake by KICA and KRA in deeding an additional 4.62 acre tract to KICA.

### a) Consideration of Subsequent Conduct

KRA presented evidence of subsequent conduct by KICA that could support their claim for reformation. In its final order the master gave little weight to that evidence and stated, "given the lack of any evidence of KICA Board's discussion of the Beachfront Strip *prior to the execution of the Beachfront Deed*, that the best evidence of KICA's intent

during the relevant period of 1994 and 1995 is its President's execution of the Agreement for [C]onveyance" (emphasis added). KRA alleges the master improperly relied upon this court's decision in *Penza v. Pendleton Station, LLC* for the proposition that a court cannot look to parole evidence if a deed is unambiguous on its face. 404 S.C. 198, 743 S.E.2d 850 (Ct. App. 2013).

To the extent the master found *Penza* to preclude its consideration of parole evidence if it found the deed was unambiguous, the master erred. The plaintiff in *Penza* appealed the master's order finding a mortgage was intended to cover two tracts rather than one. *Id.* at 201, 743 S.E.2d at 851. Penza asserted the master erred in granting summary judgment because there was an issue of fact as to whether the mortgage was intended to encumber both tracts; alternatively Penza argued the master's order reformed the deed without a showing of mutual mistake. *Id.* This court found the mortgage to be ambiguous, and that a genuine issue of material fact precluded summary judgment. *Id.* at 205, 743 S.E.2d at 853. This court then found an analysis of Penza's reformation argument was unnecessary. *Id.* at 205, 743 S.E.2d at 853-54.

Furthermore, our supreme court's decision in *Sims v. Tyler* indicates subsequent conduct is proper evidence in a reformation dispute. 276 S.C. 640, 281 S.E.2d 229 (1981). The Sims purchased two lots in a subdivision in 1969 from James Perry. *Id.* at 641, 281 S.E.2d at 229. Perry executed a deed in favor of the Sims and they recorded it. *Id.* The Sims built a house on one lot and built a doghouse and garden on the other. *Id.* at 641, 281 S.E.2d at 230. Several years later, Perry purportedly sold one of the lots to the Tylers. *Id.* at 642, 281 S.E.2d at 230. The Tylers asked the Sims to remove the doghouse so they could build a fence. *Id.* The Sims complied, then brought suit for trespass. *Id.* The trial court found the Sims' deed should be reformed and the Tylers should have possession of the lot, based on a mutual mistake between the Sims and Perry. *Id.* The *Sims* court reversed, finding "There is no evidence to support respondents' contention that the Sims did not intend to purchase this lot. The purchase price, the payment of taxes since its purchase, the construction of the doghouse and the planting of the garden are clear and convincing evidence the Sims intended to purchase" both lots. *Id.*

Because the *Penza* court specifically declined to address the reformation argument before it, the master erred in applying the summary judgment analysis in this case.[1] Additionally, applying *Sims*, we believe the master erred to the extent it failed to consider KICA's subsequent acts in determining whether to reform the deed. Therefore, we will consider those facts in the reformation analysis.

### b) Reformation of Deed

"Before equity will reform an instrument, it must be shown by clear and convincing evidence not simply that there was a mistake on the part of one of the parties, but that there was a mutual mistake." *Timms v. Timms*, 290 S.C. 133, 137, 348 S.E.2d 386, 389 (Ct. App. 1986). "A mutual mistake is one whereby both parties intended a certain thing but because of a mistake in drafting did not get what they intended." *Id.*

"In an appeal from an action in equity, tried by a judge alone, we may find facts in accordance with our own view of the preponderance of the evidence." *U.S. Bank Tr. Nat'l Ass'n v. Bell*, 385 S.C. 364, 373, 684 S.E.2d 199, 204 (Ct. App. 2009). "However, this broad scope of review does not require an appellate court to disregard the findings below or ignore the fact that the trial judge is in a better position to assess the credibility of the witnesses." *Id.* (quoting *Pinckney v. Warren*, 344 S.C. 382, 387, 544 S.E.2d 620, 623 (2001)). "Moreover, the appellant is not relieved of his burden of convincing the appellate court the trial judge committed error in his findings." *Id.* (quoting *Pinckney*, 344 S.C. at 387-88, 544 S.E.2d at 623).

### 1. KRA's Argument

Though the facts and procedural posture of this case are complex, the issue is simple: Did KRA and KICA intend for the ten-mile beachfront parcel to begin at the eastern boundary of Tract 13, as KRA claims, or the eastern boundary of the Employee Tract, where the deed begins?

---

1. KICA asserts the master properly declined to reform the deed because it was unambiguous pursuant to *Penza*. For the foregoing reasons, we disagree.

During trial, KRA presented the testimony of three KICA board members to establish KICA's intent. Leonard Long, a partner in KRA and the secretary of KICA in 1995, testified as to his understanding about the property lines. Long testified, as secretary of KICA, that he understood the beachfront strip would terminate at Tract 13, not the Employee Tract. Long testified the property description in the Agreement for Conveyance and the deed were identical, but he alleged they were both incorrect. According to Long, there was no plat of the island at the time, and, regarding a property description for the ten-mile strip, KRA "knew it was going to be loosey-goosey, but we thought we could do it." Long asserted it would have been cost and time prohibitive to survey the beachfront property before deeding it to KICA.

Long also testified about other instances where property descriptions were mistakenly drafted. Long testified that dune fields, which were supposed to have been deeded to KICA, were mistakenly not conveyed. Long also recalled that one deed mistakenly conveyed to KICA a tract in the center of the island. These improper conveyances were remedied with corrective deeds. According to KRA, these confirmatory quit claim deeds established a course of conduct for the correction of incorrect conveyances between KRA and KICA.

Patrick McKinney, another KRA partner and KICA board member, also testified. McKinney confirmed the board was comprised of four KRA members and three homeowners. According to McKinney, the board was "one man one vote" at that time. McKinney also testified KICA was a South Carolina nonprofit corporation.

Testifying in his capacity as a partner in KRA and member of KICA's board, McKinney stated he believed that the beachfront strip would begin at the eastern boundary of Tract 13, not the Employee Tract. More pointedly, McKinney testified that neither KRA nor KICA intended the additional 4.62 acres be conveyed to KICA.

On cross-examination, McKinney testified he could not recall the KICA board discussing the terms of the Agreement for Conveyance. McKinney believed he had discussions with the homeowner members of the board, but could not recall if they occurred during board meetings. McKinney also could

not remember if the KICA board ever took any official action regarding the Agreement for Conveyance or the quit claim deed itself.

The last KRA partner and KICA board member to testify was Townsend Clarkson. Clarkson was CFO for KRA and the president of KICA. In this capacity, Clarkson signed the Agreement for Conveyance on behalf of KICA. According to Clarkson, it was KICA's intent that the beachfront property begin at Tract 13 and continue for ten miles. Clarkson also testified that KRA has paid the property taxes on the 4.62 acres.

Clarkson recalled a conversation he had with Craig Weaver, the 2012 chairman of KICA's board. According to Clarkson, Weaver "recognized that ... this property should not have been transferred; that it was a mistake; and that their attorney ... at that time had told them that they—the covenants required them to go to a vote." KRA asserted a memorandum drafted by Weaver, entitled "Talking Points for KDP," evidenced the KICA board's understanding that the additional 4.62 acres was conveyed by mistake.

Clarkson acknowledged on cross-examination that he too could not recall whether there was a formal vote of the KICA board to accept the Agreement for Conveyance.

KRA also presented maps, some created by KICA, showing common areas under KICA control that do not include the additional 4.62 acres. KRA relied upon Exhibit 16.2, attached to the Development Agreement, as evidence of its intent to convey only the ten-mile stretch of beachfront property beginning at Tract 13. While it is not clear that the map begins at Tract 13, it is clear that the 4.62 acre additional lot, which is physically disconnected from the beachfront property, is not shaded in the same way the beachfront property is. KRA also presented maps it created that show the additional 4.62 acres was developable property owned by KRA. According to zoning maps maintained by the Town, the additional 4.62 acres is zoned R-3 commercial while the beachfront property is zoned as a park. Finally, maps published by KICA on its website do not show the additional 4.62 acres as common area owned by the association, though there was no evidence presented to establish when those maps were created. KRA asserted these

graphical depictions demonstrate KICA had no intent to receive the additional property and has not acted as if it did receive that property.

KRA also avows that KICA has not taken any actions to demonstrate ownership of the 4.62 acres since 1995. Clarkson testified that, during his time on the KICA board between 1995 and 2001, KICA did nothing to exercise any control or ownership over the 4.62 additional acres. Mark Pemar, a KRA employee tasked with long-range planning for Kiawah Island, agreed with Clarkson that there were no signs KICA had used the additional property.

## 2. KICA's Argument

KICA asserts KRA failed to provide clear and convincing evidence that the deed contradicts the terms of an antecedent agreement between KICA and KRA. KICA asserts the "Agreement for Conveyance obligated KRA to convey and KICA to accept a deed in precisely the same form as the Beachfront Deed."

KICA further asserts the testimony from Long, Clarkson, and McKinney "cannot be considered competent testimony" because a majority of the homeowner representatives had to approve the transaction with KRA pursuant to the South Carolina Nonprofit Corporation Act. The Act defines a conflict of interest transaction as "a transaction with the corporation in which a director of the corporation has a direct or indirect interest." S.C. Code Ann. § 33-31-831(a) (2006). According to the official comment to section 33-31-831, the subsection applies to a transaction if a director "is a general partner in a partnership or a director, officer or trustee of another entity that has an interest in the transaction." S.C. Code Ann. § 33-31-831 cmt. 1 (2006). To have a quorum to vote on a conflict of interest transaction, "a majority of the directors on the board who have no direct or indirect interest in the transaction" must vote to authorize, approve, or ratify the transaction. S.C. Code Ann. § 33-31-831(e) (2006). KICA argues there is no evidence the board ever took a vote of the three homeowner members of the board to approve the transaction, therefore, the testimony from the KRA members of the KICA board is not sufficient to express KICA's intent. KICA's argument thus appears to be that it could not have an intent because the

disinterested homeowner members never voted to express an intent.

KICA presented testimony from two of its members that they actively use and enjoy the 4.62-acre property. Wendy Kulick, a resident of Kiawah Island since 1989, testified she walked on the beach in the area of the 4.62-acre property and generally enjoyed the property. She testified if the master were to find the property is not common property, she believed she would need explicit permission from the property owner to walk in that area. However, Kulick acknowledged that there was a 99-year lease that will allow her to cross the property, regardless of who owns it.

Dr. Peter Mugglestone, who also owns property on Kiawah Island, testified that he runs most mornings and cuts through the 4.62 acres. Dr. Mugglestone also testified that he often walks in the afternoon and used the property to get to the boardwalk. Dr. Mugglestone stated he takes pictures of the wildlife on the 4.62 acre property and enjoys the property in its unaltered state.

Regarding the memo from the 2012 board chair, KICA asserts it simply demonstrated KICA's understanding that KRA did not intend to convey the 4.62 acres to KICA. KICA notes "[t]he Taking Points for [Kiawah Development Partners (KDP) ] document does not say that the 2011 KICA Board had determined that the 1995 KICA Board had not intended to receive" the additional 4.62 acres. Rather, the memo states, "Based on the examination of the record of documents available to KICA, the board is satisfied that the transfer of the property to KICA was not intended by the original parties to the [Development] [A]greement, which included [KRA] and the Town of Kiawah Island," and that "KICA does not desire to benefit from this unintended transfer of property."

Finally, KICA asserts whatever the intentions of the KRA and the Town of Kiawah Island when they signed the 1994 Development Agreement, those intentions cannot be implied to KICA because it was not a party to that agreement. KICA states there is no evidence its representatives ever saw the Development Agreement, and an agreement between KRA and the Town of Kiawah Island cannot be demonstrative of its intent.

### 3. The Master's Orders

The master issued its final order on June 4, 2014. The master found the Agreement for Conveyance was the only document related to the additional 4.62 acres that was signed by KICA. The master also found the legal descriptions in the Agreement for Conveyance and the quit claim deed were identical.

The master detailed the graphical evidence and testimony presented by KRA. The master also analyzed whether the 4.62 acres was developable, as there was testimony that KRA intended only to convey non-developable property to KICA.

The master stated, "The court finds that whatever evidence exists of KRA's intent not to convey the Beachfront Strip to KICA is only relevant to the extent the court finds the deed and Agreement for Conveyance to be ambiguous." The master determined the deed and the Agreement were unambiguous, and KRA's claims must fail. However, the master continued to analyze the evidence as if the deed were ambiguous. The master again noted the Agreement for Conveyance was the only written agreement between KRA and KICA, and the deed mirrored that agreement. Because the two property descriptions were identical, there was no mistake between the agreement and the drafting of the deed.

The master also found that KRA did intend to convey the 4.62 acres as part of the ten-mile strip of property. The master then found the 4.62-acre property was not developable; therefore, the conveyance of the additional property was consistent with the purpose of the 1994 Development Agreement, which was to convey non-developable property to KICA to hold as common area.

Finally, the master found KICA's position as a third-party beneficiary of the 1994 agreement did nothing to answer the question of KICA's intent. The master also noted it could find "no guiding legal authority to authorize, much less require, that it weigh or examine the intent of anyone who is not an immediate party to the instrument, or at least in privity thereto when determining intent for the purposes of proving mutual mistake in the context of reformation." Accordingly, the master denied KRA's request that it reform the deed.

KRA filed a motion to alter or amend the final judgment and the master issued an order denying the motion to alter or

amend on May 4, 2015. In that order, the master found his earlier discussion of the developability of the 4.62 acres "does not impact the [c]ourt's ultimate conclusion that [KRA] did not meet [its] burden on [its] claim for reformation." The master also found the 1994 agreement was inapplicable to the determination of KICA's intent, and any discussion of the Development Agreement or Exhibit 16.2, "while perhaps demonstrative of KRA's intent, does nothing to bolster any inference that it is a reflection of KICA's intent." The master noted that the potentially gratuitous nature of the transfer also does not change the analysis of the reformation claim. The master again noted its belief that the unambiguous nature of the Agreement for Conveyance and the deed militated against reforming the deed.

For the first time in the order denying KRA's motion to alter or amend, the master detailed the testimony by the KRA directors that were also KICA board members. The master found the KRA directors engaged in a "conflict of interest transaction" as defined in the South Carolina Non-Profit Corporation Act. Under the Act, a non-profit corporation may transact business with an interested director, but the transaction must be approved by a majority of the disinterested directors. The master found there was no evidence of any meeting by the KICA board to discuss the property transfer, and no evidence was presented about the homeowner KICA board members or their understanding of the agreement. After considering the application of the Act to these facts, the master found there was not clear and convincing evidence of a mutual mistake, and again refused to reform the deed.

Finally, the master found KPOG and ICCHA did not show that they asserted any discrete claims that were separately derived from their membership in KICA. The master stated, "It is KICA who has the sole right and authority to prosecute or defend [its] rights." The master then found KPOG and ICCHA did not demonstrate they had separate standing from their capacity as KICA members and should be dismissed from the case.

### 4. Analysis

While KRA did present some evidence to support their assertion that KICA shared a mutual mistake regarding what

property it intended to receive, we find KRA failed to carry its high burden to reform the deed. *See Timms*, 290 S.C. at 137, 348 S.E.2d at 389 ("Before equity will reform an instrument, it must be shown by clear and convincing evidence not simply that there was a mistake on the part of one of the parties, but that there was a mutual mistake."). The only written agreement between KICA and KRA provides that KRA will convey, and KICA will accept, the ten-mile strip of property beginning at the Employee Tract, including the 4.62 acres. We acknowledge the 1994 Development Agreement evidences that KRA intended to convey the ten-mile strip of beachfront property beginning at Tract 13; however, KICA was not a party to that agreement and KICA's intent cannot be inferred from its terms.

Admittedly, there was some evidence to support KRA's argument that KICA did not take actions consistent with owning the disputed property. KICA's maps do not indicate it owns the disputed property and the memo from KICA's former board chairman suggests the property was mistakenly conveyed. However, there is no evidence in the record that KICA intended to receive anything other than what KRA conveyed. The language in the deed and the executed Agreement for Conveyance are identical, and no witness can produce evidence that KICA's board considered the matter in any way. At its core, this case is the result of KRA's failure to have the property properly surveyed and the consequential results of that failure.

**KPOG and ICCHA'S APPEAL**

A party must be permitted to intervene, as of right, in an action when the party claims an "interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." Rule 24(a)(2), SCRCP. If a party is not permitted to intervene as of right, the trial court may permit it to intervene "when an applicant's claim or defense and the main action have a question of law or fact in common." Rule 24(b)(2), SCRCP.

"The decision to grant or deny a motion to join an action pursuant to Rule 19, SCRCP, or intervene in an action

pursuant to Rule 24, SCRCP, lies within the sound discretion of the trial court." *Ex parte Gov't Emp.'s Ins. Co. v. Goethe*, 373 S.C. 132, 135, 644 S.E.2d 699, 701 (2007). "This [c]ourt will not disturb the lower court's decision on appeal unless a manifest abuse of discretion is found resulting in an error of law." *Id.* (quoting *Jeter v. S.C. Dep't of Transp.*, 369 S.C. 433, 438, 633 S.E.2d 143, 146 (2006)). "Moreover, the error of law must be so opposed to the lower court's sound discretion as to amount to a deprivation of the legal rights of the party." *Id.* (quoting *Jeter*, 369 S.C. at 438, 633 S.E.2d at 146).

 "Generally, the rules of intervention should be liberally construed where judicial economy will be promoted by declaring the rights of all affected parties." *Id.* at 138, 644 S.E.2d at 702. "Accordingly, the [c]ourt should consider the practical implications of a decision denying or allowing intervention." *Id.* "However, a party must have standing to intervene in an action pursuant to Rule 24, SCRCP." *Id.* "A party has standing if the party has a personal stake in the subject matter of a lawsuit and is a 'real party in interest.' " *Id.* "A real party in interest ... is one who has a real, actual, material or substantial interest in the subject matter of the action, as distinguished from one who has only a nominal, formal, or technical interest in, or connection with, the action." *Id.* (quoting *Bailey v. Bailey*, 312 S.C. 454, 458, 441 S.E.2d 325, 327 (1994)).

 "It is well settled that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the [master] to be preserved." *Pye v. Estate of Fox*, 369 S.C. 555, 564, 633 S.E.2d 505, 510 (2006).

 The issue KPOG and ICCHA raise in their appeal of the master's order is not preserved for this court's review. In the early stages of the litigation, KPOG and ICCHA petitioned to intervene, either as a matter of right or with the master's permission. *See* Rule 24, SCRCP. The master found KPOG and ICCHA raised distinct interests in the disposition of the 4.62-acre property because of their proximity to the tract. The master also found KPOG and ICCHA's interests would not be adequately protected by KICA's defense because KICA did not take a position on its intent or whether there was a mutual mistake while KPOG and ICCHA asserted there

was evidence KICA intended to accept the additional land. Accordingly, the master allowed KPOG and ICCHA to intervene pursuant to Rule 24(a), SCRCP, and Rule 24(b), SCRCP.

Following the master's final order, KRA filed a motion to alter or amend that order and a motion for relief from the order granting intervention. KPOG and ICCHA filed a response to KRA's motion. In its order on the motion to alter or amend the final order, the master declined to amend any substantive portions of the order pertaining to the reformation; however, the master did decide that KPOG and ICCHA did not have standing and should not be allowed to intervene. The master found "neither intervening entity has asserted any discrete claims that are separately derived from their membership in KICA." KPOG and ICCHA immediately filed an appeal from the master's order, without filing a motion for reconsideration.

On appeal, KPOG and ICCHA assert the master confused and misapplied the legal standards for standing and intervention, which lead to a ruling wholly inconsistent with its previous ruling. This argument was never raised to the master. Therefore, we decline to address it.

## CONCLUSION

Accordingly, the decision of the trial court is

**AFFIRMED.**

HUFF and THOMAS, JJ., concur.